NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0674n.06

No. 15-2502

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SURYA NALLANI, Individually and as
Personal Representative for the Estate of
SRINIVAS NALLANI,

        Plaintiff-Appellant,

v.

WAYNE COUNTY, a Political Subdivision
of the State of Michigan, SHERIFF BENNY
N. NAPOLEON, in his Individual and
Official Capacities, DEPUTY STEVE
HUNTER, DEPUTY JASON CASE,
CORPORAL WILLIAM COVINGTON,
DEPUTY HAMMOUD, and FAYE
ZUHAIRY,

        Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Dec 15, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:     COLE, Chief Judge; DAUGHTREY and MOORE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff Surya Nallani, the personal representative for her deceased husband's estate, appeals the district court's grant of summary judgment to municipal and individual defendants on her claims brought pursuant to 42 U.S.C. § 1983, asserting that his suicide—while incarcerated in the Wayne County jail—resulted in large part from the defendants' deliberate indifference to Srinivas Nallani's serious medical needs and from the failure of the county to train jail personnel properly. Surya Nallani argues that she has identified genuine disputes of material fact that should preclude a decision in favor

of the defendants at this stage of the litigation. For the reasons set out below, we conclude that the plaintiff adduced sufficient evidence to create a genuine dispute of fact regarding the liability of defendant William Covington. We thus find it necessary to reverse the judgment in favor of Covington and remand the matter to the district court for such further proceedings as are necessary. However, we affirm the grant of summary judgment to defendants Faye Zuhairy, Hisham Hammoud, Steve Hunter, Jason Case, Benny Napoleon, and Wayne County.

## FACTUAL AND PROCEDURAL BACKGROUND

After an arranged marriage in India in 1993, Srinivas and Surya Nallani emigrated to the United States in 1995 and settled in the Detroit area where Surya, a physician specializing in geriatric medicine, eventually started her own practice in 2005. Although Srinivas was trained as an engineer, he had difficulty holding a job in the engineering field. Consequently, from 2005 until 2011, he assumed the position of office manager of his wife's practice "because he wanted to, not because [she] asked him to." In fact, whenever Surya Nallani would attempt to tell her husband that she did not want him to serve as her office manager, he would become abusive and physically violent. During one of the abusive episodes, Srinivas went so far as to kick Surya while she was pregnant and, on another occasion, hit her so forcefully that she thought he had fractured her ribs. Nevertheless, she did not seek medical attention in that latter instance because Srinivas claimed he would kill himself if she did so.

In his role as office manager, Srinivas "[h]ired and fired employees," "took care of the payroll [and] billing," and "pretty much controlled the office." In 2011, the federal government brought charges of Medicare fraud against the Nallanis. The couple was released from custody pending trial although Srinivas "was asked by the court to seek – to see a psychiatrist," either because of the fraud charges or because of a subsequent DUI conviction. Despite that

suggestion, Srinivas discontinued his visits with his therapist after six or seven months and also ceased taking his prescribed medications for depression and attention deficit disorder.

Then, in late May 2013, Surya Nallani received emails both from her pretrial officer and from her attorney, each informing her that Srinivas had attempted to purchase a firearm while still under federal indictment for the health-care-fraud charge. Surya confronted Srinivas with that fact and asked whether he had sought to purchase the weapon to harm himself or his family, a suggestion that Srinivas denied, claiming that he was attempting merely to purchase the firearm for a friend. Nevertheless, because Srinivas had lied on the purchase application by denying that he then was under federal indictment for a felony offense, FBI agents arrested him on Friday, May 31, 2013, and transported him to the Wayne County jail.

After Srinivas was booked at the jail, Gayle Hatfield, a masters-level social worker, conducted a mental-status screening of him. In her notes of that encounter, Hatfield reported Srinivas's admission that he had not seen his psychiatrist for three or four months and had not taken medications prescribed for anxiety and depression for the preceding three months. She further noted that Srinivas claimed to have tried to injure himself when he was ten years old, some 38 years before the screening. He also told Hatfield that "he was feeling suicidal earlier when he was arrested but is not feeling it now." Moreover, although he admitted that he remained "extremely depressed," Srinivas claimed that he harbored no homicidal or suicidal thoughts at the time of the screening. Because Hatfield nevertheless considered Srinivas to be unstable, extremely depressed, and anxious, and because he claimed to "hear[ ] voices telling him he is causing trouble to his family," she recommended that he be assigned to the mental-health unit of the jail.

An additional evaluation later that night by a registered nurse corroborated Hatfield's understanding that Srinivas suffered from attention deficient hyperactivity disorder (ADHD) and depression and that he had not taken prescribed medications for at least two months. The nurse's assessment, however, like that of Hatfield, was that Srinivas, at that time, had no suicidal or homicidal ideations.

Srinivas remained incarcerated over the following weekend, and on Monday, June 3, he appeared before Magistrate Judge R. Steven Whalen for a detention hearing. During that proceeding, Srinivas's own counsel asked the magistrate judge to order mental-health treatment for his client. In doing so, the attorney explained:

> I certainly know he needs the medication. His wife tells me that he was on Adderall. He has significant issues with attention deficit. I believe the reason he was buying this gun, your Honor, was to do harm to himself. I think that was a distinct possibility. I must say that. I can't think of any other rational excuse in this situation for why he did what he needed to do.

In light of that plea and Surya's statement that Srinivas "may be dangerous to himself," "that he is aggressive, he has a temper, he can be violent and there are children in the—children in the home," Judge Whalen ordered Srinivas detained pending trial. In his oral ruling, the magistrate judge noted that Srinivas "is a dangerous individual," and that if he were to be granted bond, "there is nothing that reasonably assures [the magistrate judge] that he is not going to present a danger to himself or others." As part of the order of detention, however, the magistrate judge did require that Srinivas "be assessed by a medical psychiatric/psychological professional and that he be provided with any treatment that is medically or psychiatrically necessary and that would include—that would include medication."

The following day, June 4, in compliance with the magistrate judge's order, psychologist Lisa Witulski visited Srinivas in the Wayne County jail. Although Witulski concluded that

Srinivas "does not present to be a danger to himself or others," she did note that he exhibited signs of paranoia and seemed fixated on the idea that the FBI was "out to get him." Specifically, Srinivas believed that the FBI "set him up to buy a gun," and called his former place of employment and "'made them' fire him." As a result, Witulski recommended that Srinivas see psychiatrist Faye Zuhairy the following day.

Dr. Zuhairy conducted her own evaluation of Srinivas on June 5, 2013. During his session with Zuhairy, Srinivas denied that he sought to purchase a gun for himself; instead, he insisted that he had been approached by a stranger who asked him to make the firearm purchase. In contrast to what he had related to Hatfield on the first day of his incarceration, and in contrast to what he confided both to Hatfield and to Witulski, Srinivas also failed to mention to Zuhairy that he had tried to hurt himself when he was younger or that he had entertained thoughts of suicide upon his arrest. Consequently, Zuhairy's notes from the session with Srinivas indicated that he exhibited no evidence of current suicidal ideation and that his mood had improved since the start of his incarceration. She later explained in her deposition testimony that even though patients can deny suicidal ideation but still harbor thoughts of harming themselves, she did not believe that Srinivas had done so. She justified that conclusion by stating that Srinivas did not exhibit any of the classic signs of disguising such ideation. Nevertheless, she diagnosed Srinivas with an unspecified adjustment disorder and ADHD, and she prescribed for him daily doses of Zoloft for depression and Trazodone for insomnia.

Despite that diagnosis, Zuhairy determined that Srinivas was safe to be returned to the jail's general population but that he would need a follow-up evaluation in "8-10 weeks or sooner as needed." The fact that Zuhairy made such a recommendation, however, did not mean that Srinivas was transferred immediately from the mental-health unit on the fourth floor of the jail to

a floor housing the general jail population.  As the administrator of the county mental health department stated in his deposition, a decision on whether to return an inmate to the general population from the mental-health unit, even after a psychiatrist's recommendation, would require consideration of the opinions of on-duty psychologists, nurses, and anyone else who observed the inmate in question.  Thus, despite Zuhairy's recommendation, Srinivas remained on the jail's fourth floor until June 11.

On that day, Corporal William Covington was assigned to work as the "rover" on the south end of the fourth floor of the jail during the 7:00 a.m. to 3:00 p.m. shift.  In that capacity, Covington was responsible for assisting the other deputies assigned to the southeast (4SE) and the southwest (4SW) sections of the floor in the performance of their duties.  One of those duties was to conduct checks of the inmates housed in cells 7 through 16 of 4SE.

To ensure that the inmate checks were completed as required, the county installed card readers on the wall near both cell 7 and cell 16 of 4SE, and the jail officer who conducted the check was required to swipe his or her own employee identification card at each end of the ward as he or she progressed past the cells.  On the fourth floor of the jail, such rounds were to be conducted every 30 minutes and usually took only about 20 seconds to complete.

A different procedure was employed for the first check of each shift, however.  That first check involved retrieving from the officers' duty station certain cards that contained photographs of the inmates assigned to each of the ten cells, or in the case of cards that did not yet contain photographs, an identification number that matched the number printed on the wristbands worn by the inmates.  The officer then was required, after swiping his or her employee identification badge through the reader at one end of the ward, to stop at each of the ten cells, ensure that the inmate was awake, make sure that the inmate in the cell was the person whose picture was on the

inmate card, and obtain a verbal or physical response from the inmate to ensure that the individual was still alive.  If the card did not contain a photograph of the inmate, the jailer was required to summon the inmate to the cell bars in order to match the inmate's wristband number to the number on the inmate's jail card.  If the inmate could not be roused to come to the bars for a wristband match, the officer "[wa]s to notify the supervisor and the supervisor, him and the supervisor [we]re to come up and open the bars and check the wrist band."  Typically, three to five minutes were required to complete a card census count of a ward at the start of a shift.

When Covington conducted the card census count shortly after 7:00 a.m. on June 11, however, he failed to follow the required protocol.  In fact, records from the mounted card readers showed that Covington began his card check at 7:09:59 on that morning and completed his pass through the ward at 7:10:19, a mere 20 seconds later.  Moreover, Covington admitted during his deposition in this matter that he merely performed "a card and body count" that morning and had no recollection of speaking with Srinivas or seeing his face.

Similarly, because the subsequent, twice-hourly inmate checks after the initial rounds of each shift did not require any verbal communications or other interactions with the inmates in or out of their cells, Hisham Hammoud, the deputy who undertook the 7:30 round on 4SE that day, had no interactions with Srinivas at that time.  Even though the inmate was lying on his side in his bunk facing the wall "with the blanket over his head like he was sleeping," Hammoud did not find such a situation unusual.  As he testified during his deposition, "[I]t's not unordinary for someone to sleep with a blanket over their head for a long period of time.  It happens all the time."  That morning, Hammoud did not observe Srinivas leave his cell at any time, even after the cell doors were opened after the nursing staff finished dispensing medications to the 4SE inmates.

Apparently, none of the jail personnel found it alarming that Srinivas also remained in that same covered, wall-facing position during the rounds conducted during the 8:00 and 9:00 hours. According to Hammoud's testimony, "that person could be taking a nap. He could be sleeping. I've seen people sleep several hours throughout the day due to, due to the medications. You know, sometimes these doctors give them medication and they sleep for very long times."

At approximately 10:20 a.m., however, a social worker came to the 4SE duty station and asked, "Can you have Inmate Nallani come to the window? I would like to speak to him." Hammoud first paged Srinivas over the intercom, and when Srinivas did not respond, Hammoud directed another inmate to tell Srinivas that he was wanted at the duty station window. When Srinivas also did not respond to the other inmate's attempts to awaken him, Hammoud left his post and entered Srinivas's cell. Hammoud pulled back the blanket covering the inmate and noticed that a clear plastic bag was wrapped tightly around Srinivas's head so that particles of plastic already had been inhaled into his mouth. Hammoud immediately radioed for medical assistance, ripped the bag off Srinivas's head, and performed CPR until medical personnel arrived. Unfortunately, by the time the jailers discovered that Srinivas had placed a plastic bag over his head, the inmate "was in full rigor" and was pronounced dead at 10:25 a.m., "caused by asphyxia due to suffocation." Although the exact time of Srinivas's death is not reflected in the appellate record, Dr. Werner Spitz, who examined records provided him, offered his opinion that Srinivas had been dead for several hours by the time he was discovered with the plastic bag over his head and, axiomatically, that the inmate's life could have been saved "had he been found in time."

The parties do not dispute that Deputy Jason Case performed the required card census count at 11:00 p.m. on June 10, 2013. Furthermore, although the first card census count of the

midnight shift for cells 7-16 on 4SE usually took three to five minutes, the parties agree that Case took only 27 seconds to perform those duties on June 10, the night before Srinivas died. Nevertheless, the plaintiff offers no evidence to contradict Case's testimony that he saw Srinivas sitting on his bunk with a blanket around his shoulders at 11:00 p.m. on that date, that Srinivas responded to Case's roll call by raising his hand to indicate that he indeed was the individual assigned to that cell, and that the inmates all were locked into their individual cells between 11:00 p.m. on June 10 and 7:00 a.m. on June 11, 2013. Case further explained that subsequent cell checks throughout the night did not require that the inmates be awakened every 30 minutes because "that would be cruel and unusual punishment," and that inmates commonly pull blankets over their heads as they sleep "because [they] don't like [the guards] shining the light and waking them up" when conducting the twice-hourly checks. However, during the 7:00 a.m. card census count, the deputy performing that duty was required to wake the inmates, just as the deputy performing the 11:00 p.m. count was required to do.

In light of Srinivas's death and the obvious breakdown in adherence to jail protocol, Surya Nallani filed a 42 U.S.C. § 1983 suit against Wayne County, Dr. Zuhairy, Sheriff Benny Napoleon, Deputies Hunter, Case, and Hammoud, and Corporal Covington. She alleged that all the defendants were deliberately indifferent to Srinivas's serious medical needs while in jail, that Wayne County and Sheriff Napoleon failed to train and supervise jail employees properly, and that all defendants were liable under Michigan tort principles for gross negligence and for intentional, willful, and wanton conduct. Following extensive discovery, the defendants moved for summary judgment in their favor. The district court dismissed all constitutional claims against the individual defendants, ruling that the defendants did not knowingly disregard a known, substantial risk to Srinivas's health. The district court further determined that because

the individual defendants could not be held liable for any constitutional violation, the plaintiff also could not succeed on her claims of municipal liability or her official-capacity claim against the sheriff. The plaintiff's state-law claims likewise were dismissed. Surya Nallani now appeals the district court's ruling on the federal-law claims only.

## DISCUSSION

**Standards of Review**

The district court granted summary judgment to the defendants on all claims asserted by Surya Nallani in her second amended complaint. We review *de novo* such a ruling by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Consequently, in order to defeat a motion for summary judgment, a party need not prove by a preponderance of the evidence that its position *necessarily* will prevail at trial. Instead, a non-moving party merely must introduce such evidence as will create a genuine dispute of fact that should be resolved by a jury.

In granting summary judgment in this case, the district court determined that each of the individual defendants was entitled to the protections afforded by the judicially created doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*,

555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, to defeat a claim of qualified immunity, a plaintiff must both "make out a violation of a constitutional right" and convince the court that "the right at issue was 'clearly established' at the time of the . . . alleged misconduct."  *Id.* at 232 (citations omitted).

**Alleged Constitutional Violations by the Individual Defendants**

In seeking monetary compensation for the death of her husband, Surya Nallani asserts that all named defendants are liable for violating Srinivas's rights under the Eighth Amendment to the United States Constitution.  The Eighth Amendment, as made applicable to the states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment.  This constitutional protection, however, "proscribes more than physically barbarous punishments."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  Indeed, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

The Supreme Court has recognized, however, that "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977).  As the Court explained:

> [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.  Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*Id.  See also Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016) *petition for cert. filed* (U.S. Oct. 17, 2016) (No. 16-538).  Nevertheless, we have held consistently that pretrial detainees "are . . . entitled to the same Eighth Amendment rights as other inmates."  *Thompson v.*

*Cty. of Medina*, 29 F.3d 238, 242 (6th Cir. 1994). "The analysis set forth in *Farmer*, although rooted in the Eighth Amendment, therefore applies with equal force to a pretrial detainee's Fourteenth Amendment claims." *Richko*, 819 F.3d at 915.

Under that *Farmer* analysis, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Thus, a claim of deliberate indifference under an Eighth Amendment analysis has both an objective and a subjective component. As we have explained:

> To satisfy the objective component, the plaintiff must allege that the medical need at issue is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970. Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838, 114 S. Ct. 1970 (emphasis added).

*Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001).

Against the backdrop of this analytical framework, we must evaluate the potential liability of the defendants named in the complaint. However, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

In undertaking the individualized determinations required by our precedent, we note initially that the district court concluded that the plaintiff satisfied the objective component of the deliberate-indifference analysis by highlighting the fact that Srinivas Nallani "presented with a

number of symptoms during his detention, which testimony confirmed were factors to consider when assessing an inmate's risk for suicide." Among those relevant factors were the following:

> Nallani admitted he felt suicidal at the time of his arrest; Nallani harmed himself when he was 10 years old; Nallani consistently complained that he suffered from depression and ADHD; Nallani complained that he had trouble sleeping; Nallani had a previous psychiatric history including outpatient therapy and prescriptions for psychotropic medications; at one point, Nallani testified that he was hearing hallucinatory voices; Nallani was diagnosed with major depressive disorder and anxiety disorder by Hatfield; Nallani had paranoid thoughts regarding the FBI; and Nallani was diagnosed with mood disorder and psychotic disorder by Witulski.

Because "[a] detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies," *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994), the district court clearly did not err in finding the plaintiff's factual presentation sufficient to establish the objective prong of the deliberate-indifference analysis. Indeed, as we held in *Comstock*, an allegation that defendants were indifferent to an inmate's "psychological needs, namely his suicidal tendency, . . . *easily satisfies* the objective component of [an Eighth Amendment] claim." *Comstock*, 273 F.3d at 703-04 (emphasis added). Moreover, the defendants themselves do not challenge that conclusion by the district court in their response to Surya Nallani's appellate brief. Instead, they focus their appellate argument on Nallani's alleged inability to establish that each of the individual defendants satisfies the *subjective* component of the *Farmer* paradigm.

**Defendant Zuhairy**

When alleging deliberate indifference by a medical professional in a § 1983 case, a plaintiff must do more than offer evidence that the "physician has been negligent in diagnosing or treating a medical condition." *Estelle*, 429 U.S. at 106. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* "When a prison

doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703. However, "[a] government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836.

The evidence adduced by Surya Nallani fails to create even a genuine dispute of fact over whether Zuhairy was guilty of such a reckless disregard of the risk that Srinivas would take his own life while in jail. Admittedly, the evidence is uncontroverted that Zuhairy had available to her, at the time of her evaluation of Srinivas, information that he had tried to harm himself as a child 38 years previously and that, upon his arrest, he had experienced suicidal thoughts, even though he later claimed to no longer have contemplated such self-harm. Zuhairy also was aware that Srinivas had not taken prescribed medications for depression and for ADHD for months before his arrest, that he claimed to have heard voices telling him that he was a burden to his family, that he had attempted to purchase a firearm, and that the medications prescribed for Srinivas took up to three weeks to reach their full therapeutic level. The plaintiff points to these facts and argues that they demonstrate that it was "obvious" that Srinivas's condition at the time of Zuhairy's evaluation of him on June 5 presented a medical emergency that called for around-the-clock, constant observation of the inmate.

However, merely listing those statements, viewed in isolation and out of complete context, fails to place Zuhairy's evaluation of Srinivas in an accurate light. For example, although Gayle Hatfield, a social worker, did learn during a screening interview that Srinivas, then 48 years old, "tried to hurt himself once when he [was] 10," no further information was supplied to corroborate that the "attempt" actually was an effort to kill himself. Furthermore, even though Srinivas told Hatfield that "he was feeling suicidal earlier when he was arrested," he also told her that he possessed no such feelings at the time of the screening. In fact, even Hatfield, as well as all the medical professionals who evaluated Srinivas within the first six days of his incarceration, concluded that he did not suffer from suicidal ideation.

Similarly unconvincing as grounds for a finding that Zuhairy ignored a serious risk that Srinivas would commit suicide are the revelation that the inmate had not taken his prescribed medications for a significant time before his arrest and the fact that it would take three weeks for the prescribed antidepressant medication to reach the desired level in Srinivas's body. Indeed, there is no dispute that Zuhairy, as a result of her evaluation of Srinivas, prescribed Zoloft for him in an effort to combat any feelings of depression and that, even though a therapeutic level of the drug would not be reached for as long as three weeks, "usually patients start to feel a difference within a day or so."

Also the fact that Srinivas was arrested for attempting to purchase a firearm does not create a genuine dispute over whether Zuhairy was deliberately indifferent to serious risks of harm to the inmate. As a psychiatric professional, Zuhairy discussed the attempted purchase with Srinivas and came to the conclusion that he was telling the truth when he explained to her that "somebody asked him to purchase the gun for him," and that "the application was not filled entirely by him and the rest was done by the store owner who marked no for other charges."

In short, there is no doubt that the plaintiff did adduce some evidence that her husband was depressed and anxious after he was arrested. Other evidence indicates, however, that Zuhairy discussed those feelings with Srinivas, prescribed medications to deal with the most serious of his symptoms, and noted that his mood was improving by the time she evaluated him. Even accepting the plaintiff's gloss on the evidence in the record, the most that can be said is that Zuhairy did not provide the treatment and make the recommendations that were most likely to prevent Srinivas's suicide attempt. In fact, two of the plaintiff's experts, Drs. Larry Kirstein and Thomas White, offered statements to just that effect, claiming that Zuhairy "failed to provide the necessary and reasonable care" required and engaged in "assessment practices that were inconsistent with acceptable standards of care." Such evidence might be sufficient to create a genuine dispute of fact regarding whether Zuhairy was liable for medical malpractice. However, it does not in any way suggest that Zuhairy was deliberately indifferent to or ignored Srinivas's serious medical condition. Because Eighth Amendment jurisprudence requires a showing of more than negligence or medical malpractice on the part of a defendant before a physician may be held liable in a § 1983 suit, *Estelle*, 429 U.S. at 106, the district court did not err in granting summary judgment to Zuhairy in this matter.

**Deputy and Corporal Defendants**

As alluded to earlier, the Supreme Court in *Farmer* set forth three requirements a plaintiff must meet in order to hold a prison official liable for an Eighth Amendment violation. First, "the official must . . . be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837. Second, the official, in fact, must draw that inference. *Id.* Finally, in spite of recognizing facts from which to draw an inference of a risk of harm, and actually drawing that inference, the official consciously must choose to ignore

that risk. *Id.* However, "it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." *Id.* at 844. For example, such defendants may offer proof "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* There can be no doubt that "[s]uicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). As a result, we have explained:

> [T]he proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.

*Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992).

In this case, viewing the evidence presented in the light most favorable to the plaintiff, Surya Nallani has shown that the deputy and corporal defendants were aware of numerous facts from which the necessary inference of a substantial risk of serious harm to Srinivas could be drawn. Although the jail personnel were adamant that they did not observe any warning signs that Srinivas would take his own life, the deputy and corporal defendants knew that he had been placed on a floor designated for inmates with mental illnesses. They also were aware that they were to monitor the ward for signs of suicide and that the rounds to check on the inmates were to be conducted every 30 minutes, rather than every hour, simply because the inmates on the fourth floor presented a higher and a real risk that they would attempt to harm themselves. Also, for that very same reason, the jail officials knew that they were required to have the inmates approach the cell bars if the jailers otherwise could not identify the cell's occupant during a card

census count. The plaintiff thus has pointed to testimony that at least creates a genuine dispute over whether the deputy and corporal defendants were aware of facts from which an inference could be drawn that there was a substantial risk Srinivas would harm himself while incarcerated.

Moreover, those defendants actually did draw that inference from those facts. They testified unhesitatingly, for example, that their responsibilities on the fourth floor of the jail were heightened simply because of the risk of self-harm that was presented by inmates suffering from mental disease or instability. Deputy Hammoud knew that Srinivas had been assigned a cell on the floor because of mental illness, even though the deputy was unaware of the inmate's specific diagnosis. He also testified in his deposition that the jail staff routinely observed the inmates and made frequent rounds on the ward "to ensure that there is no issue with suicide." Deputy Hunter was aware of the importance of requiring the inmates to respond to the jailers during the initial rounds of each shift "[s]o that we know they're conscious, to know that they're, you know, know that they're not injured." Deputy Case also recognized the need for heightened vigilance on the fourth floor of the jail due to the potential for suicidal behavior. And Corporal Covington echoed the need to ensure during rounds in the mental-health unit that the inmates were conscious, breathing, and not attempting suicide.

In light of these concessions by the deputy and corporal defendants, it is clear that the plaintiff has adduced sufficient evidence to create at least a genuine dispute regarding whether the individual defendants actually drew an inference that Srinivas was subject to a substantial risk of serious harm. Even so, Surya Nallani still was required to offer some proof that the defendants nevertheless chose to ignore that risk.

In an effort to do so, the plaintiff emphasized the fact that the individual defendants knew that plastic trash bags were, at that time, pinned to the wall in the ward's common area,

providing the inmates easy access to an article that could be, and was, used to commit suicide. She also emphasizes the Srinivas was depressed throughout his incarceration, that he had not taken his prescribed medication for many months, that he had expressed suicidal thoughts upon his arrest, and that another inmate later reported that Srinivas had been unusually quiet the last couple of days of his life.

### Deputy Hammoud

Nevertheless, nothing in the record before this court on appeal can be construed as evidence that Hammoud was deliberately indifferent to any risk that Srinivas would kill himself. Hammoud never observed the plastic bag in Srinivas's possession and did not fail to carry out his essential duties as a jail deputy. Even if Hammoud himself conducted any of the inmate cell checks after the initial 7:00 a.m. card census count on June 11, 2013, the fact that Srinivas appeared to be asleep in his bunk facing the wall would not have alerted Hammoud to potential danger because inmates often slept through the morning hours with blankets over their heads to block light and sound. Moreover, as soon as Hammoud was informed that Srinivas was not responding to attempts to get him to meet with a social worker, the deputy entered the cell to rouse the inmate and, after pulling back the blanket and observing the plastic bag over Srinivas's head, immediately called for medical assistance, ripped the bag away, and began life-saving maneuvers on Srinivas. The district court thus did not err in granting summary judgment to Hammoud because Hammoud did not commit any constitutional violation.

### Deputy Hunter

Deputy Hunter also cannot be deemed to have been deliberately indifferent to a known risk of harm. Hunter was scheduled to work the 11:00 p.m. to 7:00 a.m. shift on June 10-11, 2013, a time when all inmates were locked in their cells and when most inmates were asleep.

Consequently, Hunter did not find the situation at all unusual that Srinivas or any other inmate would be sleeping with his blanket pulled over his head. Because no act or omission by Hunter increased any risk of harm to Srinivas, the district court properly granted summary judgment in Hunter's favor on the plaintiff's Eighth Amendment cause of action.

### Deputy Case

Similarly, Case was scheduled to work the 11:00 p.m. to 7:00 a.m. shift on June 10-11, 2013. As part of his duties that night, he performed the 11:00 card census count during which he was required to check each of ten cells on the 4SE ward and verify that the inmates in those cells were alive, well, and where they were supposed to be. The evidence in the record verifies that, during that initial cell check, Case called out to Srinivas who responded by raising his hand while sitting on his bunk with a blanket wrapped around his shoulders. When conducting that and subsequent rounds, Case never saw Srinivas in possession of a plastic bag. Furthermore, given the fact that the additional rounds during the shift were conducted when inmates were sleeping, Case did not find it at all unusual that Srinivas would be lying on his side in his bunk, facing the wall, and have a blanket pulled over his head so as not to be disturbed by the beams of the flashlights that shone into the cells each 30 minutes. Because the plaintiff can point to no evidence that Case was deliberately indifferent to Srinivas's serious medical needs, the district court properly granted summary judgment in Case's favor on the Eighth Amendment claim.

### Corporal Covington

A discussion of Corporal Covington's liability involves a consideration not relevant to the question of whether Hammoud, Hunter, and Case were entitled to summary judgment on Surya Nallani's Eighth Amendment claim. Like the claims against the other deputy and corporal defendants, the plaintiff's claim against Covington satisfied the first two elements of the *Farmer*

deliberate-indifference analysis. Surya Nallani adduced sufficient evidence to create at least a genuine dispute of fact regarding whether Covington was aware of information "from which the inference could be drawn that a substantial risk of serious harm" to Srinivas existed. Furthermore, Covington actually drew that inference, noting in his deposition testimony that, during a card census count at the start of a shift, it is important to ensure that the inmates are conscious and breathing and that the inmates have not attempted or are attempting suicide.

Unlike the situations involving Hammoud, Hunter, and Case, however, the plaintiff has shown that there is a genuine dispute of fact regarding whether Covington deliberately chose to ignore the known risks. Specifically, Covington spent only 20 seconds completing the card census count shortly after 7:00 a.m. on June 11, despite the fact that other testimony indicated that the first such security check should take three to five minutes. Covington also admitted that he never saw Srinivas's face when conducting that initial round, does not remember if he received the required verbal response from the inmate, does not remember checking to see whether Srinivas was conscious or breathing, never tried to obtain a response from the inmate, and failed to match either Srinivas's face or wristband to the information contained on the relevant inmate card. In short, a dispute of fact exists over whether Covington, recognizing the necessity of taking special precautions to protect the safety of inmates on the jail's fourth floor, nevertheless deliberately ignored established procedures to the extent that he manifested indifference to the well-being of an individual in his charge.

Whether Surya Nallani can convince a jury that Covington's acts and omissions constituted deliberate indifference to Srinivas's plight is irrelevant at this stage of the litigation. What is significant is that the plaintiff has pointed to evidence in the record that legitimately raises the specter that Covington, cognizant of the risks to Srinivas's health presented by

incarceration, nevertheless consciously ignored those risks in an effort to ease his own work responsibilities. Indeed, given the fact that Srinivas was not found unconscious until 10:20 a.m., it is possible that if Covington had carried out his responsibilities dutifully during the 7:00 a.m. cell check, Srinivas's attempt to end his own life might have been thwarted. One of the plaintiff's experts, Dr. Werner Spitz, testified to that effect, claiming that by the time guards discovered Srinivas's suicide, the inmate "had been deceased for several hours," but that Srinivas "was salvageable had he been found in time."

Even with a finding that a constitutional violation occurred, Covington nevertheless would be entitled to cloak himself in the protections of qualified immunity if the constitutional right he is alleged to have violated was not clearly established at the time of the violation. Unfortunately for Covington, however, at least since the 1976 Supreme Court's decision in *Estelle v. Gamble*, the principle of law has been clearly established "that deliberate indifference to serious medical needs of prisoners constitutes" a violation of the Eighth Amendment, regardless of whether that indifference is manifested by prison doctors or prison guards. *Estelle*, 429 U.S. at 104-05. Consequently, the district court erred in granting summary judgment to Corporal Covington on Surya Nallani's Eighth Amendment claim.

**Sheriff Napoleon**

Surya Nallani also brings an Eighth Amendment claim against Wayne County Sheriff Benny Napoleon in his individual capacity. However, the plaintiff has offered absolutely no evidence that Napoleon knew of Srinivas's mental condition, participated in any way in the observation of the inmate, acted or failed to act in a manner that manifested deliberate indifference to Srinivas's medical needs, or approved of such unconstitutional actions or inaction. Because § 1983 liability cannot be based solely upon the principle of *respondeat*

*superior*, *Comstock*, 273 F.3d at 712, as a supervisor, Napoleon can be found liable for a constitutional violation only if he "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982). Absent identification of any evidence satisfying this standard of proof, the district court appropriately granted summary judgment to Napoleon for the claims against him in his individual capacity.

**Claims of Municipal Liability**

In the second count of her second amended complaint, Surya Nallani alleged that Wayne County and Napoleon, in his official capacity as sheriff, failed to supervise, monitor, and train correctional officers and medical staff to "detect serious medical conditions and facilitate prompt and immediate medical attention and/or transport to a hospital ER." Because a suit against a county sheriff in his or her official capacity "is nothing more than a suit against" the county itself, *Petty v. Cty. of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007), there is no need to differentiate the analyses of the validity of the claims against Napoleon and against Wayne County under Count II of the plaintiff's complaint.

Finding that none of the individual defendants were deliberately indifferent to Srinivas's medical needs—and thus that they had not violated Srinivas's Eighth Amendment rights—the district court also declined to hold the county or its sheriff liable to the plaintiff. Indeed, "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). But, because we have determined that Surya Nallani produced sufficient evidence to create a genuine dispute of fact regarding whether Corporal Covington in fact did choose to

ignore a serious risk that Srinivas could harm himself while in custody, we also must assess the potential liability of the county itself.

A plaintiff may sue a municipality for a constitutional violation if the alleged deprivation results from a policy or custom of the municipality. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). "One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).

The plaintiff alleged in her complaint that the county failed to have proper policies and procedures in place and failed to train jail employees properly to deal with inmates with mental-health issues. Some support for that allegation can be gleaned from the deposition testimony of some of the individual defendants who claimed that the deputies and corporals working on the fourth floor of the jail did not receive any formal training on how to deal with inmates with psychological problems. Instead, the guards relied upon on-the-job training to learn the relevant procedures.

Ordinarily, such testimony, even in the face of statements to the contrary, might be considered sufficient to establish the genuine dispute of fact that should preclude a grant of summary judgment. In this case, however, even that evidence highlighted by the plaintiff fails to save her claims against the municipal defendants.

As we reaffirmed in *Ellis*, "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." 455 F.3d at 700 (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)). In his case, even if the facts

were to show that the training received by the individual defendants was inadequate, the plaintiff cannot point to any evidence that would support a finding that any inadequacy was the result of the county's deliberate indifference or that any shortcomings in the training actually caused Srinivas's death.

First, the evidence before the district court was uncontroverted that the individual defendants did receive training in suicide awareness and prevention on an annual basis and that the county provided its jail employees with a "Jail Operations Manual" that included a 12-page section on "suicide awareness and response." Consequently, the record before the district court and this court on appeal does not support a determination that inadequacy in the training of jail deputies and corporals resulted from the county's deliberate indifference to the medical needs of inmates on the mental-health ward of the jail.

Even more damaging to the plaintiff's attempt to make out a failure-to-train claim is the fact that any training inadequacy was not the cause of Corporal Covington's failure to employ proper procedures when conducting his rounds shortly after 7:00 a.m. on June 11. Although Surya Nallani did produce testimony from multiple defendants that no formal training sessions were available to instruct employees on how to conduct a proper card census count, the individual defendants employed as deputies or corporals in the jail all expressed knowledge of the correct manner in which to conduct such counts. Consequently, whether learned through on-the-job training or in a formal training session, the defendant deputies and corporals were aware of the precautions that should have been taken to lessen the chances that Srinivas would have been successful in his suicide attempt.

The plaintiff cannot point to any genuine dispute of fact over whether Wayne County was deliberately indifferent to the need to train its jail employees properly or over whether the lack of

a formal training program actually prevented the individual defendants from knowing the proper procedures they were required to perform. Thus, the district court did not err in granting summary judgment to the municipal defendants on Surya Nallani's § 1983 claim.

## CONCLUSION

For the reasons set out above, we conclude that the district court's grant of summary judgment to defendant Covington must be REVERSED and this matter REMANDED for further proceedings regarding the claims against him. Because the plaintiff has failed to establish even a genuine dispute of fact regarding the § 1983 liability of the other defendants, we AFFIRM the district court's entry of summary judgment in favor of all the defendants other than Covington.