NOT RECOMMENDED FOR PUBLICATION
File Name:  25a0030n.06

Case No. 24-1536

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 23, 2025
KELLY L. STEPHENS, Clerk

KATHERINE CRADDOCK, et al.

    Plaintiffs - Appellants,

v.

WELLPATH, LLC, et al.,

    Defendants - Appellees.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

O P I N I O N

BEFORE:  McKEAGUE, GRIFFIN, and LARSEN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Stephen P. Long died by suicide in his jail cell. His estate brought a 42 U.S.C § 1983 action against Macomb County and Wellpath, LLC alleging that defendants violated Long's Eighth and Fourteenth Amendment rights by failing to thwart his suicide. The district court granted summary judgment in favor of the defendants. Because County officials did not violate Long's constitutional rights, we AFFIRM.

**I.**

In October 2019, Steven P. Long died by suicide after hanging himself in his jail cell. This put an end to what was a very unfortunate stretch of his life that began in 2004, when he suffered third and fourth degree burns in a workplace accident. The accident put Long into a coma for a month, and although Long's physical injuries healed, he was never truly whole again. Long had

always suffered from anxiety, depression, and substance abuse, but after the incident, he was diagnosed with post-traumatic stress disorder as well.

The accident worsened Long's substance abuse and caused him to have several run-ins with the law. In 2016, he was convicted of larceny from a building and concealing stolen property. Because of subsequent probation violations, Long was incarcerated at Macomb County Jail eleven times between 2016 and 2019.

Long also had a history of suicide attempts. In 2015 and 2016, he attempted suicide several times by overdosing on heroin and opiates. Long also attempted suicide by choking himself in 2017 and by overdosing in 2018. In fact, Macomb County Jail officials deemed him a high risk of suicide and placed him on suicide watch during one of his incarcerations in 2017.

In October 2019, Long ended up in Macomb County Jail for another probation violation. Long tragically committed suicide four days into his incarceration. When Long arrived at the jail, the arresting officer declared that Long did not "verbalize[] thoughts of suicide." Jail Detention Card, R. 39-2 PageID 619. During booking, a Macomb County deputy screened Long and issued a suicide risk questionnaire. As part of the questionnaire, Long denied contemplating suicide, experiencing suicidal thoughts over the past three months, or having a psychiatric hospitalization in the previous month.

Macomb County has a contract with Wellpath to provide healthcare for its jail inmates. Pursuant to the contract, a Wellpath staff member separately screened Long and conducted another suicide risk assessment. Again, Long did not express any thoughts about killing himself. Notably, he also denied attempting suicide in the past. The staff member assessed that Long did not appear "overly anxious, afraid or angry" and did not show any "signs of depression." Wellpath Screening, R. 39-4 PageID 625. The staff member also observed that Long did not show any "feelings of

helplessness and hopelessness" and overall presented an "[a]ppropriate" mood. *Id.* at PageID 626–27. His mental health status was marked as "[r]outine [p]roblems." *Id.* at PageID 627. Based on this evaluation, the staff member did not place Long on suicide watch.

But Long did admit that he had a psychiatric history to the staff member. He stated that he would "snort" nonprescribed Xanax and heroin and that he suffered from withdrawal when he stopped using the drugs. *Id.* at PageID 624. He also admitted to past use of "psychotropic meds," psychiatric hospitalization, and outpatient mental health treatment. *Id.* at PageID 626. Accordingly, the staff member recommended that a mental health professional evaluate Long. He also referred Long to a withdrawal protocol and recommended that he be put in a "Medical Detox unit." *Id.* at PageID 627. Under the protocol, Long would take detox medication to help with his anxiety and withdrawal, and Wellpath staff would assess Long every eight hours for the first five days of his incarceration. Unfortunately, Long was never evaluated by a mental health professional. Neither was he placed in a detoxification unit, which is constructed with glass panels and can be observed from the control tower. Macomb County Jail only had two such units, which are typically reserved for inmates inebriated to the point that they are unable to take care of themselves. Hence, Long was assigned the bottom bunk of a first-floor general population cell which officials could easily reach without having to use the stairs. Once in the cell, officials observed Long on an hourly basis.

Long had a tumultuous time in jail before his suicide. He struggled with the fact that he was in jail and appeared "anxious [and] nervous." Paszek Dep., R. 42-19 PageID 1974. He admitted as much during a phone conversation with plaintiff and fiancée Katherine Craddock when he proclaimed that his "life is over" and "it's the end for him" because he was likely to be sentenced to 25 years. Craddock Dep., R. 40-5 PageID 1013. Sensing Long's despondency, Craddock

inquired whether she should call jail staff and ask them to put him on suicide watch, to which Long assured her that he was fine, and he was not going to hurt himself. He stated he would never do something like that to his kids, his parents, or Craddock.

Fellow inmate Andrew Bush overheard this telephone conversation. Bush spoke with Long afterwards, and Long asked whether Bush could "get [Long] enough drugs within the housing unit to kill himself." Death Investigation Report, R. 42-20 PageID 2029. Bush did not think Long was serious about this statement and did not report his conversation to jail staff because he felt that he "sufficiently talked [Long] down." *Id.* Long had a similar conversation with his cellmate John Paszek and fellow inmate Jordon where he mentioned that even though he did not want to kill himself, he would be "okay with it" if he died from drug overdose. Paszek Dep., R. 42-19 PageID 1968. But Long never expressly mentioned that he wanted to harm himself or others. And the record does not indicate that either inmate reported these conversations to jail officials or Wellpath staff.

Long also suffered from withdrawal. Paszek claimed that Long would vomit on occasion, and complained of chest pains, and heartburn. Paszek also stated that Long would hoard his detox medication and snort coffee grounds in an attempt to get high. Consequently, staff had to seize his detox medication. Furthermore, the night before his suicide, Long banged on his cell door asking for medical help for heartburn and chest pains. During that episode he also yelled out to his "friend" Jordon and said, "I got to get out of here" and "I don't want to be here." Paszek Dep., R. 42-19 PageID 1977. Long was eventually treated for heartburn that night.

On the night Long committed suicide, Ronald Lowery, who was serving weekends in jail for violating probation, was assigned to Long's cell. At one point, Long asked Lowery whether he knew how to make a noose, to which Lowery replied he did not. Lowery was on the top bunk and

4

did not notice or hear Long tearing up the blanket that Long used to make a noose. Although Lowery thought Long appeared sad, he did not think he was going to commit suicide and did not alert jail staff. Shortly before lockdown, Lowery stepped out of the cell into the common area because Long had to use the bathroom. Long covered the cell window with paper, which was normal practice among inmates to ensure privacy. Lowery eventually walked back to his cell but could not get in. When deputies noticed Lowery outside of his cell after lockdown, they opened the cell door. Once they opened the door, Long fell to the ground and "a torn piece of a blue jail issued blanket [was] tied tightly in a knot around his neck." Death Investigation Report, R. 42-20 PageID 2025. Long was later pronounced dead.

Long's estate brought an action under 42 U.S.C. § 1983 in Macomb County Circuit Court, alleging that Macomb County and Wellpath violated Long's Eighth and Fourteenth Amendment rights through deliberate indifference. They argued that the County's unlawful custom, policy, and failure to train its employees caused the violation of Long's rights. In addition, they claimed that an unknown Sheriff's deputy employed by Macomb County was liable for wrongful death under Michigan law. Wellpath moved to remove the case to the United States District Court for the Eastern District of Michigan.

The district court dismissed the Sheriff's deputy from the lawsuit because Long's estate could not identify the deputy. The court also dismissed all Eighth Amendment claims because Long was a pretrial detainee, so the complaint's allegations only implicated the Fourteenth Amendment. Finally, the court granted defendants summary judgment on the remaining claims. The court held that Long's estate was not able to satisfy the objective component of deliberate indifference, and therefore, was unable to show that the defendants violated Long's Fourteenth Amendment rights. The court went on to explain that even if there was a violation of Long's rights,

the County's policy, or its failure to train its employees, did not cause the violation. This appeal followed.

**II.**

We review the district court's grant of summary judgment de novo and may affirm on any basis supported by the record. *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024). To hold a municipality liable under § 1983, plaintiffs must establish that one of its customs or policies caused the underlying constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). A municipal liability claim fails if there is no such violation. *See Phillips v. Tangilag*, 14 F.4th 524, 537 (6th Cir. 2021). Accordingly, we first assess whether defendants violated Long's Fourteenth Amendment rights.

**III.**

The Due Process Clause of the Fourteenth Amendment requires jail officials to "take reasonable measures 'to protect pretrial detainees from harm.'" *Campbell*, 109 F.4th at 860 (quoting *Lawler v. Hardeman Cnty.*, 93 F.4th 919, 926 (6th Cir. 2024)). When officials fail to do so, plaintiffs may bring a "deliberate indifference" claim, which traditionally consists of both objective and subjective elements. *See id.* We need not analyze the objective prong here because Long cannot satisfy the subjective element of deliberate indifference. *See Downard ex rel. Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020).

In the past, plaintiffs satisfied the subjective element if they showed that a defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk," *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). In the context of jail suicides, plaintiffs could show an official's subjective knowledge through facts that made it "obvious" that there was a "strong likelihood" that a detainee

6

would commit suicide. *Downard*, 968 F.3d at 600; *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).

But we have since modified the subjective inquiry for Fourteenth Amendment deliberate indifference. *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 316–17 (6th Cir. 2023) (explaining the divergence in the Fourteenth and Eighth Amendment deliberate indifference analysis articulated in *Brawner v. Scott Cnty.*, 14 F.4th 585 (6th Cir. 2021) in response to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). These modifications have lowered "the subjective component from actual knowledge to recklessness." *Id.* at 316. As a result, officials "can face liability even if they did not actually know of a risk of harm to a pretrial detainee." *Lawler*, 93 F.4th at 927. Instead, a detainee "need only prove that the officers recklessly disregarded a risk so obvious that they either knew or should have known of it." *Id.* Notwithstanding this change, a plaintiff must still advance facts that make it "obvious" that there was a "strong likelihood" that a detainee would commit suicide. *See Batton v. Sandusky Cnty.*, No. 23-3168, 2024 WL 1480522, at *3 n.1 (6th Cir. April 5, 2024).

As tragic as Long's death is, we find no such facts here. Long's express denials of suicidal ideation undermine the contention that his risk of suicide was obvious. *See Downard*, 968 F.3d at 601; *Nallani v. Wayne Cnty.*, 665 F. App'x 498, 507–08 (6th Cir. 2016)). In *Downard*, we held that a detainee's consistent denial of having thoughts of suicide, feelings of hopelessness, or a history of psychiatric issues across several screenings cut against a finding that there was a strong likelihood that he would commit suicide. 968 F.3d at 601. In fact, express denials can be such strong evidence that in *Nallani*, we held that there was not a strong likelihood that the inmate would commit suicide even after the inmate informed the officer that he was suicidal during his arrest, had harmed himself as a child, and failed to take prescribed anti-depressant for "months"

because, among other evidence, the inmate denied feeling suicidal during intake. 665 F. App'x at 507–08.

From the time he was booked in Macomb County Jail until an hour before he committed suicide, Long consistently denied having suicidal intentions. Long did not mention any thoughts of suicide to his arresting officer. Long denied contemplating suicide during both the Wellpath and Macomb County intake screenings and he was not placed on suicide watch. Once he was in jail, Long denied having any thoughts of self-harm every time Wellpath staff screened him for withdrawals—a total of twenty times (twice during each screening). The last denial came less than an hour before he committed suicide.

Long's denials were not limited to officials and staff. He even denied having such thoughts during conversations with others. When Craddock asked if Long should be placed on suicide watch, Long assured her that he would not harm himself. Although Long told his fellow detainees that he would be "okay with it" if he died from drug overdose, he qualified this statement by stating that he did not want to kill himself. Critically, after these conversations, no one alerted jail officials or Wellpath staff that they believed Long would harm himself. Even Long's inquiry of Lowery on tying a noose was never communicated to jail officials or Wellpath staff, undermining any contention that this statement made it obvious to the defendants that he would commit suicide.

Long's overall demeanor did not contradict these denials. Wellpath's intake form indicated that Long had an "[a]ppropriate" mood and that he did not display any signs of helplessness, hopelessness, depression, anxiety, fear, or anger. And even though Long was not placed in a detoxification unit, jail officials still observed him on an hourly basis, the last time being within an hour of his suicide. R. 39-15 PageID 712–29. During these rounds, Long appeared normal and did not exhibit any "odd behavior [or] aggression," even during the very last observation. *See*

8

*Galloway v. Anuszkiewicz*, 518 F. App'x 330, 335–36 (6th Cir. 2013). The fact that Long was not placed in a detoxification unit does not alter these observations. Regardless of where Long was located, the fact remains that Long exhibited a normal demeanor and did not convey any suicidal intentions to defendants, thereby undermining any claim that there was a strong likelihood that he would commit suicide. *See id.*; *Downard*, 968 F.3d at 601.

To be sure, Long at times appeared "anxious [and] nervous" because he was in jail and could not post bond. And these feelings were exacerbated because he feared that he would receive a long sentence. But such general despondency is not enough to suggest a strong likelihood of suicide. *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992). The same is true when Long asked Bush whether he could acquire "enough drugs within the housing unit [for Long] to kill himself." Bush did not think Long was being serious when he made those comments and he specifically testified that he "did not" inform correctional or medical staff about Long's comments because "he felt he 'sufficiently talked [Long] down." So jail officials and Wellpath staff had no knowledge of these statements.

Long's past suicide attempts and mental health history are also not enough. Long attempted suicide several times between 2015 and 2019. But Long denied making any such attempts at intake, and jail officials claim they did not have access to the records detailing his attempts. Long has offered no evidence to the contrary. But even if they were aware of these attempts, past suicide attempts alone are not enough to show a strong likelihood that an inmate would commit suicide, especially when, as here, the inmate denies harboring such intentions and "presented no other obvious signs of risk." *Lawler*, 93 F.4th at 931; *Downard*, 968 F.3d at 601; *Mantell v. Health Pros. Ltd.*, 612 F. App'x 302, 306–07 (6th Cir. 2015) (explaining that officers could not have drawn an inference of a substantial risk of suicide when detainee denied being suicidal at intake and

presented in a calm compliant manner even though he previously attempted suicide and his girlfriend warned officials that he might try to attempt suicide again); *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) (holding that defendant was, at most, negligent when he knew of previous suicide attempts and was told that the inmate should be "watched" but did not investigate further); *compare Schultz v. Sillman*, 148 F. App'x. 396, 401–03 (6th Cir. 2005) (holding that an inmate's suicidal risk was obvious when jail officials knew of the decedent's past suicidal tendencies, knew that these suicidal ideations stemmed from the inmate's kidney problems, and observed him crying from kidney pain and ignored repeated requests to go to the hospital).

And the recency of the attempts matters too. Here, Long's past attempts occurred at least a year before he was admitted to the Macomb County Jail. On the few occasions in which this court considered past suicide attempts sufficient to establish deliberate indifference, the attempts occurred during the same period of confinement as the actual suicide. *See Perez v. Oakland Cnty.*, 466 F.3d 416, 420, 421, 424–25 (6th Cir. 2006) (holding that there was a genuine issue of fact concerning the objective component of deliberate indifference based on attempted suicides in the past and the attempt in the same facility a month before suicide); *Troutman v. Louisville Metro Dept. of Corr.*, 979 F.3d 472, 477, 480, 484 (6th Cir. 2020) (holding that past suicide attempt satisfied objective prong of deliberate indifference when it occurred in the same facility eleven days before suicide).

Similarly, Long's withdrawals on the night before his suicide do not change our conclusion. Long was off his detox medication because Wellpath staff confiscated his pills. That night, Long banged on the door of his cell asking for medical help for heartburn and chest pains, which he eventually received. We have held that such disruptive behavior does not indicate a strong

likelihood of suicide when the inmate complaints about his physical condition but does not say anything about suicide. *Lawler*, 93 F.4th at 933; *Gray*, 399 F.3d at 614–16. The record does not indicate Long mentioned anything about harming himself that night. During that episode he also yelled out to his "friend" Jordon and made statements like "I got to get out of here" and "I don't want to be here." But an "inmate's despondency coupled [] with other stressors, like drug withdrawal" also do not indicate a strong likelihood of suicide. *Downard*, 968 F.3d at 601 (citing *Baker-Schneider v. Napoleon*, 769 F. App'x 189, 193–94 (6th Cir. 2019)); *see also Nallani*, 665 F. App'x at 508.

Therefore, based on this record, a reasonable jury could not conclude it was "obvious" to any jail official or Wellpath personnel that there was a "strong likelihood" that Long would commit suicide. *Lawler*, 93 F.4th at 316; *Downard*, 968 F.3d at 601. Without that, Long's estate cannot satisfy the subjective element of deliberate indifference. Hence, Long's Fourteenth Amendment rights were not violated. Without an underlying constitutional violation, Long's municipal liability claims against Macomb County and Wellpath fail. *See Phillips*, 14 F.4th at 537; *Barber*, 953 F.2d at 240.

We AFFIRM the district court's judgment.