RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KAREN DOWNARD, Administrator for the Estate of Tye
L. Downard,

                          *Plaintiff-Appellee*,

    v.

RUSSELL L. MARTIN, et al.,

                          *Defendants*,

AMY FOLEY; DANIEL WALLACE,

                  *Defendants-Appellants*.

> No. 20-3046

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:17-cv-00560—Algenon L. Marbley, District Judge.

Decided and Filed: July 31, 2020

Before: SUHRHEINRICH, GIBBONS, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Daniel T. Downey, Angelica M. Jarmusz, FISHEL DOWNEY ALBRECHT &
RIEPENHOFF LLP, New Albany, Ohio, for Appellants. Samuel H. Shamansky, SAMUEL H.
SHAMANSKY CO., L.P.A., Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

JULIA SMITH GIBBONS, Circuit Judge. After nearly two decades as a detective for the
City of Reynoldsburg Police Department, Tye L. Downard ("Tye") was arrested and charged

with a federal drug trafficking offense.  While awaiting a preliminary hearing, Tye committed suicide in his cell at the Delaware County Jail.  Karen Downard ("Downard"), the administrator of Tye's estate, filed suit in the Southern District of Ohio, naming, among others, Officer Amy Foley and Officer Daniel Wallace as defendants.  In her complaint, Downard asserts federal claims pursuant to 42 U.S.C. § 1983 for deliberate indifference to Tye's serious medical need and state-law claims for wrongful death and survival.  The district court denied summary judgment to Foley and Wallace, finding that neither was entitled to federal qualified immunity or immunity under Ohio law.  They appeal those decisions.  Because the facts and inferences as found by the district court do not, as a matter of law, show that Foley or Wallace was aware that Tye posed a "strong likelihood" of attempting suicide, we reverse.

I.

Tye worked for nearly twenty years as a detective with the City of Reynoldsburg Police Department.  He was an undercover officer for fifteen of those years.  In 2015, the Federal Bureau of Investigation received information that Tye "was using his official position to engage in illegal activity—namely, drug trafficking."  No. 2:16-mj-97, DE 1, Compl., PageID 2.  Tye was arrested the following year and charged with a federal drug trafficking offense.

On February 18, 2016, the United States Marshals Service delivered Tye to the Delaware County Jail.  He was to be held at the jail until his preliminary detention hearing on February 25.  When Tye arrived at the jail, he was accompanied by a Prisoner Custody Alert Notice from the United States Marshals Service.  The notice provided that Tye "[s]eems despondent, but has not stated he is suicidal."  DE 51-1, Prisoner Custody Alert Notice, PageID 855 (double emphasis in original).  It also flagged that Tye was a law enforcement officer and should be "house[d] accordingly."  *Id.*  A checkbox labeled "suicidal" was left unmarked.  *Id.*

At the jail, Foley completed the intake process with Tye.  She first administered the Suicide Prevention Screening.  The screening form, which consists of sixteen "yes" or "no" questions, required Foley to elicit responses from Tye and register certain observations about his appearance and demeanor.  When responding to the questions, Tye denied any thoughts of suicide, feelings of hopelessness, or history of psychiatric issues.  Foley likewise reported no

visible signs of distress, noting only that Tye was a "peace officer."   DE 47-6, Suicide Prevention Screening Guidelines, PageID 762.

Foley then administered the Standard Medical Questions.  As with the Suicide Prevention Screening, Foley recorded that she observed no "behavior" or "statements" that would suggest Tye was at "risk of suicide."  DE 47-7, Standard Medical Questions, PageID 763.  The only "medical issue[] or problem[]" reported by Tye was "heartburn."  *Id.*  When Tye and Foley completed the Suicide Prevention Screening and Standard Medical Questions, they signed their names at the bottom of each form.  The two forms were completed in a total of approximately four minutes.

Foley placed Tye in administrative segregation and assigned him to a holding cell, HC6, located in the booking area.  There are many reasons an inmate might be placed in administrative segregation, including "professional status," protection from other inmates, protection of other inmates, medical care, and risk of suicide.  DE 47-19, Administrative Segregation, PageID 785–86.  Although an inmate's risk of suicide is not a standard reason for being housed in the booking area, holding cells allow for near-constant observation analogous to a suicide watch.  Foley noted only that Tye had been placed in administrative segregation and housed in the booking area "due to being [a law enforcement officer]."  DE 47-14, Jail Briefing & Pass on Sheet, PageID 779.

That same afternoon, a nurse reviewed the suicide and medical screening forms that Foley completed.  The nurse then administered her own physical and mental health assessments.  In response to the "yes" or "no" inquiries from the nurse, Tye again denied any thoughts of suicide, feelings of hopelessness, or history of psychiatric issues.  The nurse likewise reported no outward signs of distress, finding that Tye's behavior, conduct, and "state of consciousness" were not "abnormal in any way."  DE 47-8, Receiving Screening, PageID 765.

The next morning, on Friday, February 19, Tye met with a mental health clinician, Douglas Arnold, who administered a Mental Status Exam.  Arnold reported only "[n]ormal [f]inding[s]" under each category of psychological health and functioning, including demeanor, mood, thought process, behavior, affect, and cognition.  DE 42-1, Mental Status Exam, PageID 537.  He also reported an absence of delusions, impairment, self-abuse, and aggression.  Arnold

wrote that Tye "voiced feeling the stress of his circumstances" and was "[c]onscious of the distress caused to family (wife & children), need to repair relationships, answer for his actions/suffer consequences." *Id.* He further noted that Tye "[v]oiced hope about restoring connection to loved ones, self to community/society over the course of time" and that Tye planned to call his wife because she "showed interest in talking to him." *Id.*

Arnold did not designate Tye as a suicide risk or place him on a suicide watch. He directed, however, that Tye should remain housed in the booking area until Monday, February 22, when he could be reassessed. That directive was communicated to officers via a short note in one of the Jail Briefing and Pass on Sheets for February 19. The note states: "Doug Arnold assessed [Tye] today, it has been determined [that he] stay in HC3 until [Arnold] can speak with him again Monday. [Tye] is not on a watch at this time."[1] DE 47-16, Jail Briefing & Pass on Sheet, PageID 781.

Tye remained in the booking area without incident until Sunday, February 21. At some point between 4:05 AM and 2:30 PM on February 21, Tye was moved to a new cell, C8, located outside of the booking area. The parties agree that, at 4:05 AM, Wallace had moved Tye into a different holding cell, HC2, still located inside the booking area. When he did so, Wallace changed the reason for Tye's cell assignment from "Isolation" to "General." DE 47-11, Cell Assignment History, Page 769. But the parties dispute whether it was Wallace or another officer who ultimately moved Tye from HC2 to C8.

As relevant to our inquiry, the district court determined that there was a genuine dispute of fact as to whether Wallace moved Tye from HC2 to C8. No matter the culprit, however, the parties agree that Tye was no longer housed in the booking area by Sunday afternoon. And they agree that, shortly before 1:00 AM on Monday, February 22, Tye committed suicide in C8.

After Tye's death, his wife filed suit in the Southern District of Ohio, naming, among others, Foley and Wallace as defendants. In her complaint, Downard asserts federal claims

---

[1]Assistant Jail Director Jessie Jackson also sent an email to several supervising officers and medical staff with a summary of the Mental Status Exam as described to her by Arnold. Neither of the defendants in this case received that email, and Downard concedes that they would have only seen the information included on the Jail Briefing and Pass on Sheet.

pursuant to 42 U.S.C. § 1983 for deliberate indifference to Tye's serious medical need and state-law claims for wrongful death and survival. Foley and Wallace moved for summary judgment. The district court denied their motion, holding that neither of them was entitled to federal qualified immunity or immunity under Ohio law. Foley and Wallace timely appeal.

## II.

Although "[a]n order denying a motion for summary judgment is generally not a final decision" over which we have jurisdiction, limited review is available if, as here, "the summary judgment motion is based on a claim of qualified immunity." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). In such cases, a district court's denial of a claim of qualified immunity may be reviewed "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We lack jurisdiction, however, in so far as "the district court determines that factual issues genuinely in dispute preclude summary adjudication." *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). Thus, while we may review "abstract legal issues," a district court's determination of "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial," is insulated from review. *Johnson v. Jones*, 515 U.S 304, 313 (1995). The same is true of inferences drawn by the district court. *Romo v. Largen*, 723 F.3d 670, 674–75 (6th Cir. 2013).

Whether a prison official acted with deliberate indifference to an inmate's serious medical need is a mixed question of law and fact. *Bishop v. Hackel*, 636 F.3d 757, 764 (6th Cir. 2011). "The legal standard for deliberate indifference is a question of law, and the [defendant's] knowledge and conduct are questions of fact." *Id.* Here, in turn, we have jurisdiction to review whether the facts and inferences as determined by the district court "show a violation" of the deliberate indifference standard. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999); *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 437 (6th Cir. 2002). Moreover, "if the district court has cited no facts or evidence" in support of a legal determination, we may search the record to determine whether that determination is supportable. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015). And a "defendant-appellant may—indeed, for some arguments, must—point to some other of the plaintiff's record evidence, or some incontrovertible record evidence, to support [its] argument [for reversal on legal grounds]." *Id.*

III.

Foley and Wallace raise two issues on appeal. First, they argue that the district court erred in denying them qualified immunity from Downard's deliberate indifference claim. Specifically, they contend that, even accepting the facts and inferences as found by the district court, neither of them was deliberately indifferent to Tye's serious medical need. Second, Foley and Wallace argue that the district court erred in denying them state-law immunity from Downard's wrongful death and survivor claims. As the parties acknowledge, the availability of immunity under Ohio law—at least in this case—is coterminous with that of federal qualified immunity. Accordingly, we address Foley and Wallace's qualified immunity arguments before turning to the issue of state-law immunity.

A.

Foley and Wallace first argue that the district court erred in denying them qualified immunity from Downard's deliberate indifference claim. To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). In the present case, Foley and Wallace challenge only the district court's determination that, based on the version of facts most favorable to Downard, a reasonable jury could find that they acted with deliberate indifference to Tye's serious medical need.

Under the Fourteenth Amendment, pretrial detainees have a "right to adequate medical care." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005). A prison official violates that right when he acts with "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference standard contains both an objective and subjective component. *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008). First, under the objective component, an inmate must show a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, under the subjective component, an inmate must show both that an official knew of her serious medical need and that, despite this knowledge, the official disregarded or responded unreasonably to that need.

*Comstock v. McCray*, 273 F.3d 693, 703 (6th Cir. 2001). Although Foley and Wallace contest the district court's finding that Tye suffered from an objectively serious medical condition, we need not decide the issue because Downard cannot satisfy the subjective component.

Foley and Wallace contend that the district court erred in holding that they possessed the requisite knowledge of Tye's serious medical need. To satisfy the subjective component of the deliberate indifference standard, a plaintiff must show both that a prison official "subjectively perceived facts from which to infer substantial risk to the prisoner" and that he "did in fact draw the inference." *Comstock*, 273 F.3d at 703. "An official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation," cannot support a claim of deliberate indifference. *Farmer*, 511 U.S. at 838 (emphasis added). An official's subjective knowledge, however, may be inferred from the fact that an inmate's "substantial risk" of harm was "obvious." *Id.* at 842. In the context of prison suicides, this means that it must have been obvious that there was a "strong likelihood" an inmate would attempt suicide. *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992)).

Here, the district court held that it would be reasonable to infer that Foley and Wallace knew that Tye was "at risk of suicide." DE 59, Op. & Order, PageID 899–900. With respect to Foley, the district court found that the Custody Alert Notice informing her that Tye was a law enforcement officer and "seems despondent," DE 51-1, Alert Notice, PageID 855, supports the inference that Foley was aware of a suicide risk. That conclusion, the district court reasoned, was supported by the fact that Foley noted Tye's law enforcement status on his suicide screening form and then placed him in a booking-area cell on administrative segregation—a form of confinement that allowed for heightened observation analogous to that a prisoner would receive on suicide watch. The same was true of Wallace, the district court explained, because the Jail Briefing and Pass on Sheet stated that Tye should remain in the booking area until Arnold could speak with him again on Monday.

Foley and Wallace contend that the district court's factual determinations do not satisfy the subjective component of the deliberate indifference standard. We agree. As noted above, "it is not enough to establish that an official may have acted with deliberate indifference to some

*possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide." *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013); *see also Barber*, 953 F.2d at 239–40 (holding that a prison official must have "knowledge of a strong likelihood," not just a "mere possibility," that an inmate will attempt suicide); *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660–61 (6th Cir. 1994) (same). This is a high bar and typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm. *See Grabow v. County of Macomb*, 580 F. App'x 300, 309 (6th Cir. 2014) (collecting cases). The district court here failed to apply the "strong likelihood" standard, finding only that Foley and Wallace perceived some undefined risk that Tye might attempt suicide.

The facts and inferences as found by the district court do not evince a "strong likelihood" that Tye would commit suicide. With respect to Foley, neither Tye's profession nor his low spirits made it obvious that he posed a "strong likelihood" of attempting suicide. We have held that despondency following an arrest is normal and does not suggest a "strong likelihood" of suicide. *Barber*, 953 F.2d at 239–40. Similarly, even when an inmate's despondency is coupled with other stressors, like drug withdrawal, we have found that a strong risk of suicide is not obvious if the inmate expressly denies feeling suicidal. *See, e.g.*, *Baker-Schneider v. Napoleon*, 769 F. App'x 189, 193–94 (6th Cir. 2019) (holding that an inmate who "cried intermittently" during intake and was "withdrawing from heroin" did not present a "strong likelihood" of suicide because he denied feeling suicidal). Indeed, even an inmate's recent threats of suicide do not make it obvious that he poses a "strong likelihood" of suicide if he denies feeling suicidal at intake. *See Nallani v. Wayne County*, 665 F. App'x 498, 507–08 (6th Cir. 2016) (holding that an inmate who informed the intake officer that he felt suicidal during his arrest, had a history of self-harm, and had failed to take a prescribed anti-depressant for "months" did not present a "strong likelihood" of attempting suicide because he denied feeling suicidal when asked by the officer).

Downard argues that these cases are all distinguishable because, unlike Tye, none of those inmates were law enforcement officers. But she cites no case for the proposition that an inmate's law enforcement background conveys a strong probability that he will attempt suicide,

let alone that Foley was aware of such information. And we have held that an inmate's membership in a high-risk group does not alone make it obvious that he will attempt suicide. *See, e.g.*, *Crocker ex rel. Estate of Tarzwell v. County of Macomb*, 119 F. App'x 718, 723 (6th Cir. 2005) ("Jail officials cannot be charged with knowledge of a particular detainee's high suicide risk based solely on the fact that the detainee fits a profile of individuals who purportedly are more likely to commit suicide."); *Barber*, 953 F.2d at 239–40 ("[S]imple knowledge that the detainee fits the profile of a high suicide risk is not enough. It must be knowledge specific to that particular detainee.").

When considered with the fact that Tye expressly denied feeling suicidal—first to the Deputy Marshal transporting him and then to Foley—no reasonable jury could find that Foley "perceived a strong likelihood of suicide." *Galloway*, 518 F. App'x at 336; *see also Mantell v. Health Prof'ls Ltd.*, 612 F. App'x 302, 306–07 (6th Cir. 2015) (holding that an inmate who "fit [the] profile" of someone more likely to attempt suicide and who was flagged as a suicide risk by the arresting officer did not present a "strong likelihood" of attempting suicide because the inmate denied feeling suicidal at intake). In fact, when Foley screened Tye for mental health issues, he denied any feelings of hopelessness or thoughts of suicide, and he appeared calm and stable. A nurse and a mental health clinician made the same findings shortly thereafter. Although Foley noted Tye's law enforcement background and housed him in the booking area, she never designated him as a suicide risk or placed him on a suicide watch. No jury could find that those actions reflected a belief that Tye posed a "strong likelihood" of attempting suicide.

Downard's claim against Wallace fares no better. The district court found a genuine dispute of fact as to whether it was Wallace who removed Tye from the booking area. We thus assume that it was Wallace. It is, in turn, reasonable to infer that Wallace knew that Tye required some form of heightened supervision because the Jail Briefing and Pass on Sheet stated that Tye should remain in the booking area until Monday. But those facts alone do not evince a "strong likelihood" that Tye would attempt suicide. As the Jail Briefing and Pass on Sheet expressly noted, Arnold did not believe that Tye was suicidal and the reason for Tye's cell assignment was listed only as "Isolation." DE 47-11, Cell Assignment History, PageID 769. An inmate's risk of suicide is not a standard reason for being held in the booking area. And there

were many other reasons that an inmate might have been assigned to administrative segregation, including "professional status," protection of other inmates, and protection from other inmates. DE 47-19, Administrative Segregation, PageID 785–86.  Although Wallace was likely negligent in failing to investigate why Tye was in the booking area, the facts available to him did not make it obvious that Tye posed a "strong likelihood" of suicide.

## B.

Foley and Wallace also argue that the district court erred in denying them state-law immunity from Downard's wrongful death and survival claims.  Under Ohio law, state employees are immune from suit unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6)(b).  As relevant here, an employee acts in a reckless manner if he displays "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct."  *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016) (quoting *Anderson v. Massilon*, 983 N.E.2d 266, 273 (Ohio 2012)).  "When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'"  *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)).  It follows that, because neither Foley nor Wallace acted with deliberate indifference to Tye's serious medical need, each is entitled to immunity from Downard's state-law claims.  *See, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002) (granting immunity under § 2744.03(A)(6)(b) based on an earlier finding that officers had not acted with deliberate indifference).

## IV.

Based on the foregoing, we reverse.