RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CONNIE OVERSTREET, Personal Representative of the
Estate of Paul Richard Bliven,

*Plaintiff-Appellant*,

*v.*

ONTONAGON COUNTY, MICHIGAN, a corporate subunit
of government; DALE RANTALA, Sheriff, JASON
DEVERE CLINESMITH, GIRARD WALDROP, DOUG
WILLIAMS ROBERTS, and JOHN JASON HASENBERG, in
their individual and official capacities,

*Defendants-Appellees*.

No. 25-1873

───────────────

Appeal from the United States District Court for the Western District of Michigan at Marquette.
No. 2:23-cv-00098—Maarten Vermaat, Magistrate Judge.

Argued: April 30, 2026

Decided and Filed: May 8, 2026

Before: SUTTON, Chief Judge; CLAY and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Racine M. Miller, THE MICHIGAN LAW FIRM, PC, Birmingham, Michigan, for
Appellant. G. Gus Morris, MCGRAW MORRIS MASUD, Troy, Michigan, for Appellees. **ON
BRIEF:** Racine M. Miller, THE MICHIGAN LAW FIRM, PC, Birmingham, Michigan, for
Appellant. G. Gus Morris, John T. Gemellaro, MCGRAW MORRIS MASUD, Troy, Michigan,
for Appellees.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  Paul Bliven committed suicide while a pretrial detainee in the Ontonagon County Jail.  A representative of his estate sued the County and several of its corrections officers.  She argued that the officers acted with deliberate indifference to the risk that Bliven would kill himself and that the County's policies facilitated his suicide.  But Bliven told the officers that he did not have any suicidal feelings and that he had never tried to commit suicide before.  Qualified immunity thus protects the officers because a reasonable jury could not conclude that they knew of a strong likelihood that Bliven would take his life.  And the County did not enact any jail policies with the deliberate indifference required to hold it liable for its employees' actions.  We thus affirm the district court's grant of summary judgment to all defendants.

I

Bliven lived in Ontonagon County in Michigan's Upper Peninsula.  His mental-health struggles sometimes led him to mistakenly believe that criminals were "breaking into his home." Rep., R.59-2, PageID 450.  One such incident occurred on January 8, 2021.  On that day, a worried Bliven called 911 and told the dispatcher that he had fled to his basement armed with a shotgun in fear of intruders.  Deputies with the Ontonagon County Sheriff's Department responded to the call.  They found no evidence of intruders.  Yet Bliven confessed that he had shot his firearm out the window.  His neighbors confirmed that they heard at least two shots.  They also explained that Bliven's random gunfire had caused recurring concerns.  A deputy decided to commit Bliven because his mental illness threatened to "seriously physically injure [him]self or others[.]" *Id.*, PageID 453.

The next day, Bliven arrived at Marquette General Hospital for about two weeks of inpatient mental-health treatment.  During his stay, Bliven repeatedly denied having any current or past suicidal feelings.  Doctors ultimately diagnosed him with an "Unspecified Psychotic

Disorder" and discharged him on January 25.  Rep., R.62-2, PageID 738.  For the next several months, Bliven engaged in no erratic behavior (at least so far as the record reveals).

But he soon returned to his dangerous ways.  On May 22, Bliven's neighbor called the police after someone shot at the neighbor's home "several times."  Rep., R.55-2, PageID 202. Troopers with the Michigan State Police spoke with the neighbor and came to suspect Bliven of firing the shots.  They detained him and called in the state crime lab.  While lab personnel investigated, the troopers questioned Bliven.  He confessed to shooting at his neighbor's home with an air rifle but said some delusional things in the process.  According to Bliven, he fired "lasers" at the neighbor's home because the neighbor belonged to a "gang" that was using "microwave frequencies to fry him from the inside."  *Id.*, PageID 203.  During the questioning, the troopers also noticed that Bliven had what they described as "meth bite[s]" (itchy scabs) on his arms.  *Id.*  The troopers thus recommended that prosecutors charge Bliven with reckless discharge of a firearm, aggravated assault, and methamphetamine possession.  They arrested Bliven and transported him to the Ontonagon County Jail.

The jail still followed COVID-19 protocols at this time.  These protocols required new inmates to quarantine for 14 days.  Corrections officers would presumptively use the jail's detox cell to isolate new inmates.  The jail otherwise reserved this detox cell for "intoxicated" or "suicidal" inmates so that the officers could regularly observe them.  Jail Policy, R.55-14, PageID 385.  The detox cell also had fewer items in it to reduce the risk that inmates might harm themselves.  It contained only a toilet, mattress, blanket, and pillow.

When one new inmate occupied the detox cell, officers might use what they called the "capious" cell to house a second new inmate for the isolation period.  Waldrop Dep., R.55-6, PageID 243.  That cell contained more items, including a bunk bed, bench, table, toilet, sink, shower, television, and electric fan.  The record leaves unclear how the cell got its name.  As the district court recognized, courts historically issued a writ of *capias* when they ordered officers to take someone into custody.  *See Overstreet v. Ontonagon County*, 2025 WL 2486708, at *1 n.1 (W.D. Mich. Aug. 29, 2025).  Perhaps the cell once housed those subject to these writs.  But officers have come to use it to detain female inmates.  In all events, we will follow the parties'

lead in how to spell the name of this cell, which, as relevant now, housed new inmates quarantining during the pandemic.

Girard Waldrop, a corrections officer, booked Bliven into the jail. The intake process required him to ask Bliven a litany of questions and input the answers into an electronic form on his computer. Among other questions, Waldrop asked Bliven if he currently had suicidal feelings or had ever thought about killing himself. Bliven answered no. Bliven also gave a negative answer when asked if he had plans to harm himself in the jail. Yet Bliven did disclose some modest red flags. He suggested that he had previously felt useless or hopeless when his spouse died two years ago (although he clarified that he had not had those feelings recently). And Bliven flagged his mental-health treatment at Marquette, noting that the hospital had prescribed him anxiety pills that he no longer took. Waldrop also believed that Bliven might be intoxicated or have mental-health problems because Bliven claimed that the jail needed to check him for radiation from his microwave. Waldrop lastly could tell that Bliven's arrest had made him "mad" because he was "screaming a lot[.]" Waldrop Dep., R.55-6, PageID 252. Despite these issues, Waldrop otherwise saw no "cause to think that [Bliven] would harm himself." *Id.*, PageID 262.

When an officer inputs an inmate's responses to these screening questions, the computer program picks the inmate's classification. The program classified Bliven as either minimum or medium risk. (The record has contradictory evidence on this point.) Yet Waldrop also had to use his judgment on where to detain Bliven. Officers would normally place potentially intoxicated inmates in the detox cell. But that cell was unavailable on May 22 because the door had swollen and become nearly impossible to open. So Waldrop put Bliven in the capious cell for the 14-day isolation period. Waldrop had to "override" the computer for this placement because it flagged that only females should remain in this cell. *Id.*, PageID 249. Although Waldrop would have normally asked a supervisor for this override, he did not need this permission during the pandemic.

Bliven's next several days in the capious cell passed without incident. Jail policy requires officers to perform rounds checking on inmates at least once an hour in unpredictable

intervals.   The record contains no evidence that Bliven ever expressed concerns to officers during these many checks.

A state court arraigned Bliven via video around 1:30 p.m. on May 26.   Bliven's lawyer discussed his physical ailments but raised no mental-health concerns.   The court set Bliven's bail at $50,000.

Later that afternoon, Officer Doug Roberts worked at the jail desk.   He took calls, made rounds, monitored security cameras, and handled anything else that might arise.   Jail records show that Roberts performed a round checking on inmates (including Bliven) at 1:25 p.m.

Jason Clinesmith, the jail administrator, subsequently decided to try to fix the detox cell's door using a grinder.   That cell was only 25 feet away from the capious cell.   Clinesmith thus warned Bliven at 2:09 p.m. that there "was going to be some noise."   Clinesmith Dep., R.55-8, PageID 313.   Bliven responded: "it's your jail do whatever the fuck you want."   *Id.*   Clinesmith thanked him and began grinding down the door.   Roberts decided to help Clinesmith with this task for safety reasons.   The project thus took him away from monitoring the security cameras at the desk.   But jail policies did not require him to continuously watch the cameras.

About 20 minutes after Clinesmith spoke to Bliven, Deputy John Hasenberg completed his patrol shift and arrived at the jail.   Hasenberg spoke with Clinesmith and Roberts and then walked to the main office with the security cameras.   Around 2:45 p.m., he looked at the screen from the capious cell's camera and noticed Bliven "standing" in a "weird manner[.]"   Hasenberg Dep., R.55-10, PageID 351.   Hasenberg zoomed in on the cell and recognized that Bliven was hanging.   A half hour before, Bliven had used the electric fan's cord to create a makeshift noose, stepped up on the bench, tied the cord to a window frame, and stepped off the bench.   The officers rushed to the cell and cut Bliven down.   Hasenberg called 911 while Clinesmith began CPR.   Paramedics arrived in 10 minutes.   But they could not save Bliven and pronounced him dead at the scene.

Connie Overstreet, Bliven's daughter and his estate's representative, sued Waldrop, Roberts, Clinesmith, Hasenberg, Sheriff Dale Rantala, and Ontonagon County.   Overstreet alleged that the individual defendants (collectively, the "Officers") had acted with deliberate

indifference to the risk that Bliven would commit suicide.  And she sought to hold Ontonagon County liable for this constitutional violation under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Overstreet also pursued negligence and wrongful-death claims under Michigan law.

After the parties conducted discovery, the district court granted summary judgment to the Officers and County.  *See Overstreet*, 2025 WL 2486708, at *19.  The court held that no reasonable jury could find that any Officer subjectively believed that Bliven would commit suicide.  *Id.* at *9–15.  It also rejected Overstreet's *Monell* claim against the County.  *See id.* at *16–18.  Lastly, it declined to exercise supplemental jurisdiction over her state-law claims.  *See id.* at *19.

II

Overstreet has appealed the dismissal of her deliberate-indifference claims against the Officers and her *Monell* claim against the County.  We review the district court's rejection of both claims de novo, while accepting Overstreet's position on any of the genuinely disputed facts.  *See Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022).

A. Individual Claims Against the Officers

The Officers have raised a qualified-immunity defense against Overstreet's deliberate-indifference claims.  To rebut this defense, Overstreet must show two things.  She must show that the Officers violated the Constitution.  *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).  And she must show that the governing precedent clearly established the right that they infringed at the time that they acted.  *See id.* at 63.

To satisfy qualified immunity's first (constitutional) requirement, Overstreet must identify the right that the Officers allegedly violated.  *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 926 (6th Cir. 2024).  Different rights protect different detainees.  *See id.*  A prisoner whom a court has convicted has a right against "cruel and unusual punishments" under the Eighth Amendment.  U.S. Const. amend. VIII.  In contrast, a pretrial detainee like Bliven whom a court has yet to punish has a right against "depriv[ations]" "of life, liberty, or property,

without due process of law" under the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.
The distinction between these two rights historically did not matter because our precedent
followed the same test for claims that officers acted with deliberate indifference to the risk of
harm to an inmate.  *See Lawler*, 93 F.4th at 926–27.  In September 2021, though, we adopted a
more lenient test for pretrial detainees like Bliven.  *See Brawner v. Scott County*, 14 F.4th 585,
591–97 (6th Cir. 2021).

But this recent change does not affect this case if we resolve it by jumping to qualified
immunity's second (clearly established) prong.  *See Lawler*, 93 F.4th at 925, 927.  Bliven
committed suicide in May 2021, so the events here took place before we lowered the standards
for pretrial detainees the following September in *Brawner*.  As a result, that later decision had yet
to "clearly establish anything" when the Officers acted months earlier.  *Id.* at 927.  To show a
violation of clearly established law, then, Overstreet must meet the more demanding deliberate-
indifference test that applied to pretrial detainees before *Brawner*.  *Id.* at 927–28.

That test has both objective and subjective elements.  *See Farmer v. Brennan*, 511 U.S.
825, 834 (1994).  The objective element requires a plaintiff to show a "substantial risk of serious
harm" to an inmate.  *Id.*  Suicide no doubt qualifies as a serious harm.  *See Lawler*, 93 F.4th at
928.  Yet what suffices to establish the "substantial risk" that this harm would arise?  *Farmer*,
511 U.S. at 834.  Does the suicide alone prove that this risk existed?  Or must estates that
represent deceased inmates identify objective markers that predate a suicide, such as a prior
suicide attempt?  Our cases have gone both ways on these questions.  *See Lawler*, 93 F.4th at
928–29 (collecting cases).

That said, our cases have uniformly recognized that the subjective element sets "a high
bar" in suicide cases.  *Gibson v. Abate*, 2025 WL 1913247, at *2 (6th Cir. July 11, 2025).  As a
general matter, a plaintiff must establish both that an officer knew "of facts from which the
inference could be drawn that a substantial risk of serious harm exist[ed]" and that the officer
personally drew this "inference."  *Farmer*, 511 U.S. at 837.  And even if plaintiffs meet this test,
they still must show that the officer "responded" in an unreasonable way to the known risk.  *Id.*
at 844.  When applying this framework to the suicide context, we have recognized that suicide is
hard "to predict" and "often occurs without warning."  *Gray v. City of Detroit*, 399 F.3d 612, 616

(6th Cir. 2005). To account for that reality, we have rejected deliberate-indifference claims when an officer knew only of a "*possibility*" or "even a *likelihood*" that inmates would take their lives. *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020) (quoting *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013)). We have instead held that plaintiffs must show that an officer believed that there was a "strong likelihood" that an inmate would commit suicide. *Lawler*, 93 F.4th at 929 (quoting *Barber v. City of Salem*, 953 F.2d 232, 235 (6th Cir. 1992)).

How can plaintiffs satisfy this "demanding" strong-likelihood test? *Id.* (citation omitted). They might rely on direct evidence, such as testimony that an officer believed that an inmate posed a strong suicide risk. *See id.* But officers do not commonly "admit" to these beliefs. *Id.*; *Stewart v. Warren Cnty. Bd. of Comm'rs*, 821 F. App'x 564, 570 (6th Cir. 2020). So plaintiffs often must fall back on circumstantial evidence to prove an officer's knowledge. *Lawler*, 93 F.4th at 929. To avoid summary judgment using this evidence, the suicide risk must have risen to such a level that a reasonable jury could find that the officer knew of the risk from its obvious nature alone. *See Farmer*, 511 U.S. at 842. Our cases do not find this test easily met. Plaintiffs "typically" must introduce suicide-specific evidence—such as evidence that an officer knew that a doctor had placed an inmate on "suicide watch" or that the inmate had expressed suicidal feelings. *Downard*, 968 F.3d at 601. In contrast, more generic evidence—such as evidence of an inmate's depressed state—will typically fall short. *See Lawler*, 93 F.4th at 930. And an inmate's consistent denial of suicidal feelings represents "strong" circumstantial "evidence" that the officers lacked the required knowledge. *Craddock v. Wellpath, LLC*, 2025 WL 278577, at *4 (6th Cir. Jan. 23, 2025).

Here, Overstreet's evidence does not meet the demanding standards for this subjective element, so we need not consider whether she has met the standards for the objective one. *Cf. Downard*, 968 F.3d at 600. Under § 1983, Overstreet may not impose liability on one Officer for the actions of others. *See Hehrer v. County of Clinton*, 161 F.4th 955, 964 (6th Cir. 2025); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). So Overstreet must prove that each Officer possessed the required beliefs. *See Hehrer*, 161 F.4th at 964. We will consider them in turn.

*Officer Waldrop*. No reasonable jury could find that Officer Waldrop subjectively believed there was a "strong likelihood" that Bliven would take his life when Waldrop booked him into the jail. *Lawler*, 93 F.4th at 930. To start, Overstreet lacks direct evidence that Waldrop held this belief. Waldrop instead testified that he "was shocked" when he learned that Bliven committed suicide because Bliven "didn't give [the Officers] any cause to think that he would harm himself." Waldrop Dep., R.55-6, PageID 261–62. Next, Overstreet did not produce the type of circumstantial evidence that could permit a reasonable jury to find that Waldrop believed Bliven was suicidal despite his sworn statements to the contrary. *See Lawler*, 93 F.4th at 929–30. In fact, most circumstantial evidence cuts the other way. Bliven told Waldrop that he was not currently feeling suicidal. Intake Assess., R.55-3, PageID 214; *cf. Craddock*, 2025 WL 278577, at *4; *Lawler*, 93 F.4th at 931. Bliven also disclosed that he had never tried to kill himself in the past. Intake Assess., R.55-3, PageID 214. He disclosed that he had no plans to harm himself in the jail. *Id.* And he disclosed that he had no recent feelings of hopelessness. *Id.*

Overstreet responds by pointing to three other things that Waldrop learned from speaking with Bliven: that Bliven had recently received mental-health treatment at a hospital, that he may have been intoxicated, and that he seemed to suffer from a "mental condition" because he raised concerns about "radiation from his microwave." *Id.*, PageID 213–14. But these bits of information fall far short of the type of circumstantial evidence that can create a genuine issue of material fact over an officer's state of mind. *See Lawler*, 93 F.4th at 930. Indeed, we have rejected other deliberate-indifference claims with much stronger circumstantial evidence. We have held, for example, that "even an inmate's recent threats of suicide" do not suffice when coupled with the inmate's current denials of feeling suicidal. *Downard*, 968 F.3d at 601 (discussing *Nallani v. Wayne County*, 665 F. App'x 498, 507–08 (6th Cir. 2016)); *see Lawler*, 93 F.4th at 931. And we have held that an officer's knowledge of "generic risk factors" (such as an inmate's mental-health struggles or painful drug withdrawals) do not suffice without specific evidence of an immediate suicide risk. *Lawler*, 93 F.4th at 931–32 (discussing *Crocker ex rel. Est. of Tarzwell v. County of Macomb*, 119 F. App'x 718, 723 (6th Cir. 2005)); *see Mantell v. Health Pros. Ltd.*, 612 F. App'x 302, 307 (6th Cir. 2015). This case should be no different. As the sheriff explained, inmates commonly make strange comments in jail (like Bliven's comment

about the microwave) and those comments do not raise a "red flag of suicide." Rantala Dep., R.55-7, PageID 290.

Overstreet also criticizes several of Waldrop's actions, including his decision to put Bliven in a cell with an electric-fan cord and his failure to refer Bliven for a mental evaluation. But the question whether Waldrop "responded reasonably" to a suicide risk only matters if he subjectively believed that this risk existed. *Farmer*, 511 U.S. at 844. Because no reasonable jury could find that Waldrop held such a belief, we need not consider the propriety of his actions.

*Officer Roberts*. Overstreet argues that Officer Roberts failed to adequately monitor Bliven on the day that he committed suicide. This claim fails for similar reasons. She points to no direct evidence that Roberts believed Bliven was suicidal. In fact, Roberts testified that he "never had any troubles" with Bliven. Roberts Dep., R.55-9, PageID 340. And when Roberts conducted a cell check at 1:25 p.m. (less than 50 minutes before Bliven committed suicide), he did not notice anything unusual. Overstreet also has even less circumstantial evidence against Roberts than she does against Waldrop. No evidence suggests that Roberts knew anything about Waldrop's background or mental health.

Overstreet responds that Roberts unreasonably left his desk monitoring the security cameras to help Clinesmith repair the detox cell's door. But the jail had no policy requiring an officer to monitor security cameras at all times. Besides, this argument again addresses a separate question: whether Roberts "responded reasonably" to the risk that Bliven would commit suicide. *Farmer*, 511 U.S. at 844. So it is irrelevant to our holding, which turns on Roberts's lack of knowledge that a suicide risk even existed.

Overstreet also tries to withstand summary judgment against Roberts by quoting our statement that a jury should resolve the point at which "bare minimum observation ceases to be [a] constitutionally adequate" response to a substantial risk of harm. *Helphenstine v. Lewis County*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Greene v. Crawford County*, 22 F.4th 593, 609 (6th Cir. 2022)); *Howell v. NaphCare, Inc.*, 67 F.4th 302, 316 (6th Cir. 2023). In these cases (which applied *Brawner*'s lower standard), we first held that the "obvious" nature of an inmate's medical needs could allow a jury to find the subjective element met. *Helphenstine*, 60 F.4th at

318; *see also Howell*, 67 F.4th at 316.  We then added that the additional question whether the officers acted reasonably merely by observing the inmate also belonged to a jury. *See Helphenstine*, 60 F.4th at 326.  Here, by contrast, we need not reach this additional question because it was far from "obvious" that Bliven would take his life.  *Id.* at 318.

*Jail Administrator Clinesmith*. The same logic dooms Overstreet's claims against Clinesmith, the jail administrator.  Like the other Officers, Clinesmith testified to his belief that Bliven showed "no signs of being suicidal."  Clinesmith Dep., R.55-8, PageID 317.  He also confirmed that Waldrop properly placed Bliven in the capious cell because Bliven "displayed no signs of any kind of suicidal ideation."  *Id.*, PageID 318.  And Clinesmith had almost no interaction with Bliven.  So Clinesmith knew of no facts (let alone "obvious" ones) that would allow a reasonable jury to find that he was lying about his beliefs.  *Farmer*, 511 U.S. at 842.

Overstreet counters that Clinesmith had a brief interaction with Bliven moments before Bliven killed himself.  When Clinesmith told Bliven that he was about to make noise fixing the detox cell's door, Bliven responded: "it's your jail do whatever the fuck you want."  Clinesmith Dep., R.55-8, PageID 313.  According to Overstreet, this hostile remark showed that Bliven harbored suicidal feelings.  But nothing about the statement mentioned suicide or conveyed any type of distress.  As Clinesmith said, "at that time" Bliven gave "no sign of any kind of harm to himself[.]"  *Id.*  And no reasonable jury would draw the conclusion that Clinesmith knew of Bliven's secret suicidal feelings merely because Bliven used all-too-common profanity.

*Deputy Hasenberg*. Overstreet fares even worse with her claims against Deputy Hasenberg.  Hasenberg may have had prior interactions with Bliven back in January 2021, but he had not "formed any type of opinion" about Bliven's mental state.  Hasenberg Dep., R.55-10, PageID 350.  And although Hasenberg knew that Bliven was in the "facility" in May, no evidence suggests that he knew anything else about Bliven.  *Id.*  So he also did not know any facts that would make it "obvious" that Bliven would likely commit suicide.  *Farmer*, 511 U.S. at 842.

Overstreet has one rebuttal.  She claims that jail policy required Hasenberg to immediately check on the inmates upon his arrival at the jail and that Hasenberg should not have

spoken to Roberts and Clinesmith beforehand.  Yet counsel admitted at oral argument that the claim against Hasenberg would fail if Hasenberg arrived at the jail after Bliven committed suicide.  Oral Arg. 8:55–9:00.  And undisputed evidence shows this order of events.  Hasenberg arrived at the jail at 2:30 p.m.—about fifteen minutes *after* the video shows Bliven committing suicide.  So Overstreet's argument fails on its own terms.  Regardless, no evidence suggests that Hasenberg had a duty to check cells because he was a deputy rather than a corrections officer.  And even setting that fact aside, Overstreet's argument still implicates only whether Hasenberg "responded reasonably" to Bliven's suicide risk.  *Farmer*, 511 U.S. at 844.  But we reject her claim because Hasenberg lacked knowledge of that risk.

*Sheriff Rantala*.  This analysis leaves Overstreet's claim against Sheriff Rantala.  Overstreet concedes that Rantala had no "personal knowledge" of Bliven's circumstances.  *Beck v. Hamblen County*, 969 F.3d 592, 601 (6th Cir. 2020).  As sheriff, though, Rantala oversaw the jail's policies.  And Overstreet argues that two of those policies were deliberately indifferent to a generic suicide risk for all inmates: the policy to hold inmates in a cell with an electric-fan cord and the policy not to require officers to monitor the security cameras at all times.  We doubt that plaintiffs could use generic evidence to bypass the usual rule that an officer must know of a "strong likelihood" that a *specific* inmate would commit suicide.  *Lawler*, 93 F.4th at 929 (citation omitted).  But we need not resolve the point in this qualified-immunity context.  Even if the theory has merit, Overstreet points to no case that would render it "beyond debate" that the policies violated the Fourteenth Amendment.  *Beck*, 969 F.3d at 601 (citation omitted).  So qualified immunity protects Rantala on this claim.  *See id.*

Apart from her individual theories against each Officer, Overstreet also raises high-level factual and legal points about why they should *all* face liability.  Factually, she claims that Bliven told his attorney during a jail call that he would "rather just lay down in [his] cell and die" and that he would "die in here."  Appellant's Br. 23 (quoting Compl., R.1, PageID 7).  And she claims that a reasonable jury could find that the Officers all knew about this call because the jail recorded it.  But Overstreet cites only her complaint for these allegations.  Although we must take her view of the disputed facts at this stage, she must produce more than the "bare allegations of the complaint" to trigger that rule.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.

1992).   So we may ignore these evidence-free allegations when deciding whether to grant summary judgment to the Officers.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).

Legally, Overstreet argues that four cases purportedly prove that a "classic jury question" exists over the Officers' state of mind.  Appellant's Br. 23 (citing *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472 (6th Cir. 2020); *Lawrence v. Madison County*, 695 F. App'x 930 (6th Cir. 2017); *Linden v. Washtenaw County*, 167 F. App'x 410 (6th Cir. 2006); *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001)).   Contrary to Overstreet's representations, though, *Lawrence* involved a state-law negligence claim, not a constitutional deliberate-indifference claim.  *See* 695 F. App'x at 931.   And the inmates in the other three cases posed greater suicide risks.  In both *Troutman* and *Linden*, the inmates had unsuccessfully tried to kill themselves just days before they did so.  *Troutman*, 979 F.3d at 477–80; *Linden*, 167 F. App'x at 414.   And in *Comstock*, a psychologist had decided that an inmate was suicidal before changing his mind. 273 F.3d at 698, 704.  Unlike the inmates in *Troutman* and *Linden*, Bliven never previously tried to commit suicide.  And unlike the psychologist in *Comstock*, the Officers never found Bliven suicidal.

One last point.  Overstreet argues that our conclusion (that her evidence would not permit a reasonable jury to find that the Officers knew of the suicide risk) ignores her expert.  But the expert asserted that the Officers' practices fell below the standard of care and that they "should" have done things differently.  Appellant's Br. 40–43.  This type of expert evidence might suggest that the Officers "should have perceived" the suicide risk.  *Stewart*, 821 F. App'x at 572 (citation omitted).  But such a "should have" standard does not suffice to hold them liable.  *Id.* (citation omitted).  Instead, the Officers must have *actually* perceived that risk.  *See Farmer*, 511 U.S. at 837–38.  And the evidence does not meet this more demanding standard.

### B. *Monell* Claim Against the County

Overstreet also challenges the dismissal of her *Monell* claim against Ontonagon County. (She also brought this claim against Sheriff Rantala, but official-capacity suits seeking damages from an officer add nothing to *Monell* claims against a county.  *See Hehrer*, 161 F.4th at 967.)

Plaintiffs cannot hold a county liable under § 1983 simply because its employees commit a constitutional violation. *See Monell*, 436 U.S. at 691. Rather, the plaintiffs must show that the county's conduct itself represents "the 'moving force' behind" the constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). To make this showing, plaintiffs must connect the violation to a county "policy" or "custom." *See Gambrel*, 25 F.4th at 408. Plaintiffs next must show that the county "acted with 'deliberate indifference'" to the fact that this policy or custom would lead its employees to violate the Constitution. *Id.* (quoting *Brown*, 520 U.S. at 407). Finally, plaintiffs must show that the policy or custom "actually caused" the complained-of harm. *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 70 (2011)). "Very few cases" have met these standards in this suicide context. *Gray*, 399 F.3d at 618.

This is not one of the rare cases that does. Overstreet tries to connect Bliven's suicide to three policies. But none of her three theories satisfies the required elements. Overstreet first tries to tie Bliven's suicide to the County's policy of not requiring its officers to monitor the security cameras at all hours of the day. But the County "*did* have policies in place" to prevent harm to inmates. *Troutman*, 979 F.3d at 490. It required officers to check on inmates at least once an hour in irregular intervals. Policy, R.55-14, PageID 372. And Overstreet has not shown that the County acted with "deliberate indifference" to the constitutional rights of jail inmates by enacting this monitoring policy. *Brown*, 520 U.S. at 410. Under that "stringent standard of fault," *id.*, a plaintiff cannot hold a municipality liable for the violation of a constitutional right unless the right was "clearly established," *Campbell v. Riahi*, 109 F.4th 854, 862 (6th Cir. 2024) (quoting *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017)). But Overstreet identifies no cases clearly establishing that counties must require their officers to watch security cameras 24 hours of the day.

Overstreet next argues that the Officers violated the County's policy requiring them to place intoxicated or suicidal inmates in the detox cell. Yet the *Officers'* "negligent" failure to follow policy does not establish that the *County* itself acted with deliberate indifference. *Troutman*, 979 F.3d at 490. Overstreet's second theory thus would improperly impose vicarious liability on the County for the alleged misconduct of its employees. *See Brown*, 520 U.S. at 410.

Overstreet fares no better with her third theory: that the County ratified the Officers' unconstitutional conduct by failing to adequately investigate it. This alleged ratification occurred after Bliven committed suicide and thus could not have *caused* that suicide by itself. *See Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020). Rather, Overstreet must allege that the County engaged in a "series of" prior "investigative failures" to show that its systemic deficiencies generated the "harmful action" in her case. *Id.* But Overstreet did not even try to identify any prior incidents. So this theory lacks the necessary evidence.

We affirm.